## THE STATE v. CRISP, *Appellant.*

### Division Two, February 12, 1895.

1. **Criminal Practice:** WITNESS: EXPERT: INSANITY. A witness without any particular acquaintance with defendant and without any knowledge as a medical man is not competent to testify as an expert as to defendant's insanity.

2. ———: ———: ———: ———. Where a trial for murder has been delayed for three years, it is not error for the trial court to refuse to stop the trial in order to afford physicians time to examine defendant so as to enable them to form an opinion on the question of his sanity.

3. ———: VERDICT: SUNDAY. A verdict returned into court on Sunday is valid (Revised Statutes, 1889, sec. 3260).

*Appeal from Webster Circuit Court.*—HON. ARGUS COX, Judge.

AFFIRMED.

*R. F. Walker*, Attorney General, and *Morton Jourdan*, Assistant Attorney General, for the state.

(1) The trial court did not err in excluding the testimony of witness Sullivan as to defendant's sanity. He was not an expert and did not otherwise qualify himself to give his opinion on the question presented. (2) The court did not err in refusing to suspend the trial and to make an order requiring physicians to examine defendant in order to enable them to express an opinion on his sanity. Besides the defendant not having assigned the foregoing as a ground for a new

trial, waived his objection to the court's action. *State v. Kaiser*, 28 S. W. Rep. 186; *State v. Catlin*, 118 Mo. 100; *State v. Day*, 100 Mo. 242; *State v. Gilmore*, 100 Mo. 1. (3) The verdict was properly returnable on Sunday. R. S. 1889, sec. 3260.

GANTT, P. J.—This is an appeal from a conviction of murder in first degree. The defendant Crisp was indicted at the August term, 1891, of the circuit court of Wright county for the murder of John Pruet in said county on the twenty-seventh day of July, 1891. The cause was delayed by continuances until the September term, 1893, when two unsuccessful attempts were made to secure another continuance and defendant applied for and obtained a change of venue to Webster county, where the cause was tried at the March term, 1894, and resulted in a verdict of guilty.

The conduct of defendant's counsel in incumbering this record with forty pages of typewritten matter relating entirely to the impaneling of the jury, when no objection was made to the qualification of any member of the panel, deserves a rebuke. The mass of immaterial matter that is daily dumped into this court is enormous. The science of making a correct bill of exceptions has apparently been lost. These bills no longer show the handiwork and learning of the skilled lawyer, but consist principally of immaterial questions and answers, through which we are compelled, in criminal cases, to grope in search for the facts of the case and the errors complained of.

The evidence for the state tends to show these facts: On the twenty-seventh day of July, 1891, the deceased resided in Montgomery township in Wright county; the defendant resided in the same neighborhood, being employed by, and living with, a Mr. Garrett. On this day the deceased was engaged in plowing

corn upon the farm and near the house of his father; one horse was drawing the plow; double lines were being used; they were being carried over the right shoulder, across the back and under the left arm of the deceased. Near the field where the deceased was plowing was some wood land, through which and near to the field, ran a branch or ravine. The defendant, armed with a double-barrel shotgun, came down this branch or ravine to near where the deceased was, secreted himself behind a clump of volunteer corn, and when the deceased had driven down to the end of the corn row and was in the act of turning, the defendant fired the fatal shot. The deceased dropped, falling over the plow handles. The defendant ran down to a corner of the fence and again secreted himself. He was positively identified by a younger brother of deceased who was looking for some steers. The report of the gun was heard by the father and two younger brothers at the house. The smaller brother ran to the house with the information that his brother' had been shot, and the father and two other brothers ran to the scene of the murder. When Riley Pruet, who was about one hundred yards ahead of his brother Joe and his father, reached the scene of the shooting, the defendant fired from the secreted corner two shots at him, both of which took effect: after the last shooting he ran off up the hill. At the time of this shooting he was positively identified.

After being arrested, the defendant broke jail upon two different occasions. While in jail he made a voluntary statement to the witness, Hickman, in which he admitted the killing, and that he did the shooting.

The defense was three fold: *First*, an attack upon the veracity of the father and brothers of deceased by proving their reputation for truth and veracity was bad; *second*, proof of threats by the Pruets

against defendant and self-defense; *third*, plea of insanity. There was some evidence tending to prove all these.

Defendant testified in his own behalf to an attack on him by the Pruets, and that he shot the two sons in self-defense. There is no other evidence tending to corroborate him on this point in the slightest degree.

The motion for new trial is based on the following grounds:

*First.* The admission of illegal and incompetent evidence; *second,* the exclusion of competent evidence; *third,* because the jury reached a verdict by agreeing to abide by a majority vote; *fourth,* because the verdict was rendered on Sunday, a nonjudicial day; *fifth,* newly discovered evidence; *sixth,* because the jury disregarded the instructions on murder in the second degree, insanity and self-defense.

No complaint is made of the instructions given, or of the refusal of any asked. The court was extremely liberal to defendant in the instructions given in his behalf, covering every phase of his defense. We are restricted to the matters assigned in his motions for a new trial and in arrest.

I. The first assignment in this court is the alleged error in refusing to permit Hubbard Sullivan to give his opinion of defendant's insanity. To properly appreciate this point, it should be stated that the circuit court permitted this witness to detail all the so-called strange and unnatural conduct he had observed in defendant, and then counsel for defendant undertook to qualify the witness as an expert. It was developed that the extent of his information as an expert was that he had had experience with men that they claimed were insane. "I have also took charge of them and took care of them." Upon this qualification he was asked whether or not, in his judgment, Crisp was insane the

day before the killing, and, upon objection, his opinion was refused.

While it is the unquestioned law of this state that a witness, who has had opportunities for knowing and observing the conversation, conduct and manners of the person whose sanity is in question, may testify, not only to particular facts, but to his opinion, based upon actual observation of the person, this does not authorize one who has no such acquaintance or observation to express an opinion. In this case Sullivan had no such acquaintance or observation as would enable him to express an intelligent opinion on the subject. The matters he detailed had not the slightest tendency to show defendant was insane. The fact that he had seen some other insane people by no means constituted him an expert who was entitled to give an opinion as such. A general knowledge as a medical man, at least, is required to enable one to testify as an expert in questions pertaining to insanity. Certain it is that the court committed no error in not permitting the witness, Sullivan, to testify as an expert, and, according to his own evidence, he had no particular acquaintance with defendant. He did not even know where he resided a day before the killing, until told he lived at Garrett's.

There is no foundation to the objection in regard to Dr. Henson. He was permitted to testify.

The two physicians, Drs. White and Jackson, both disclosed that they were not experts in insanity, and, moreover, that they had not had sufficient opportunity for examination to express an opinion. There was no error in excluding their mere opinion under these circumstances.

There is nothing to show that the court refused Drs. Jackson and White the privilege of examining the defendant. If, by this, defendant means that the court

should have stopped the trial and given these physicians unlimited time to observe the defendant and form their opinions as to his sanity, there is no merit in it. The defendant had delayed this trial nearly, or quite, three years by continuances and dilatory methods, and there was ample time for observations of his mental condition. His mind seems to have been very clear when a delay was sought. He made affidavits for continuances and changes of venue and testified in his own behalf. These documents and his testimony do not bear evidence of any considerable mental aberration pending the trial of this cause.

There is nothing to sustain the assertions in the motion for a new trial that the jury reached their verdict by any unlawful or irregular means, or that there was any newly discovered evidence, or that the jury disregarded the instructions.

As to the point that the verdict was returned on Sunday, it is sufficient that the statute (section 3260, Revised Statutes, 1889) expressly provides that the courts may hold sessions on Sunday for the purpose of receiving verdicts. We have gone carefully through this entire record, and all the assignments of error. We are impressed that the defendant is guilty of a cold-blooded assassination. He shot his unsuspecting victim from ambush, and, not content with this, shot the brother who came to minister to his victim. His crime belongs to that class of murders committed by lying in wait. He has had the benefit of the law's delays and fair trial, in which no error was committed against him. The judgment is affirmed and the sentence of the law will be carried into execution. All of this division concur.